UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of

OTKRITIE INTERNATIONAL
INVESTMENT MANAGEMENT LIMITED,
a company incorporated in the British Virgin
Islands,

OTKRITIE SECURITIES LIMITED,
a company incorporated in England and Wales,
and

OTKRITIE FINANCIAL CORPORATION JSC,
a company incorporated in the Russian Federation,

To Issue Subpoenas for the Production of
Documents for Use in a Foreign Proceeding.

Civil Action No.12-MC-



**DECLARATION OF MICHAEL C. MILLER IN SUPPORT OF SIXTH
APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782 TO ISSUE SUBPOENAS
FOR THE PRODUCTION OF DOCUMENTS FOR USE IN A FOREIGN PROCEEDING**

I, Michael C. Miller, hereby declare as follows:

1.      I am an attorney admitted to practice before this Court and a member of the firm

Steptoe & Johnson LLP, counsel to Otkritie International Investment Management Limited

("Otkritie Management"), Otkritie Securities Limited ("OSL"), and Otkritie Financial

Corporation JSC ("Otkritie Financial," and collectively, "the Otkritie Entities" or "Applicants")

in the above-captioned proceeding.

2.      I make this Declaration in support of the accompanying sixth application ("Sixth

Application") for an Order under 28 U.S.C. § 1782 ("Section 1782"), directing the Bank of New

York Mellon ("BONY"), Deutsche Bank Trust Company Americas ("Deutsche"), HSBC Bank USA, N.A. ("HSBC"), J.P. Morgan Chase Bank N.A. ("J.P. Morgan"), Standard Chartered Bank ("Standard Chartered"), UBS AG ("UBS"), and Wells Fargo Bank, N.A. ("Wells Fargo," and collectively, "Discovery Respondents") to produce documents responsive to the subpoenas annexed hereto as "Exhibits 1 to 7."

3.     This Application follows five previously-granted applications for judicial assistance, filed on January 4, February 21, April 13, May 24, 2012, and August 6, 2012, respectively. *See In re Application of Otkritie Int'l Invest. Mgmt. Ltd. et al. to Issue Subpoenas for the Production of Documents for Use in a Foreign Proceeding*, at DE 9, 13,  No. 12-MC-1 (S.D.N.Y. 2012); *In re Application of Otkritie*, at DE  8, No. 12-MC-118 (S.D.N.Y. 2012); *In re Application of Otkritie*, at DE 1, No. 12-MC-177 (S.D.N.Y. 2012); *In re Application of Otkritie*, at DE 8, No. 12-MC-262 (S.D.N.Y 2012).

4.     With the first five applications, Applicants' sought primarily U.S. dollar clearing records from banks located in the District and suspected to have unwittingly facilitated a fraud on the Applicants masterminded by Applicants' former employee, Georgy Urumov ("Urumov"). Applicants also sought records relating to securities transactions predating the fraud and believed to have been part of the fraudulent scheme, and documents and testimony pertaining to a post-fraud transaction which, if successful, would have helped Urumov and his co-conspirators to avoid detection.  All of the applications were filed in support of a civil fraud action pending in the High Court of Justice, Queen's Bench Division, in the United Kingdom, captioned *Otkritie International Investment Management Ltd. et al. v. Urumov et al.*, 2011 Folio 1182 (hereinafter,

Doc. # DC-8045230 v.5

"the U.K. Action"). *See, e.g., In re Application of Otkritie*, 12-MC-1, at DE 1 ¶¶ 1, 10-11. Each successive application has been aimed at helping Applicants to stay abreast of the suspected fraudsters' asset dissipation efforts and to aid in worldwide asset freezing efforts.

5.      Unless otherwise stated, this Declaration is based upon my personal knowledge as obtained through communications with third-parties having direct knowledge, including U.K. counsel to the Otkritie Entities, and a review of documents produced in connection with the U.K. Action and related proceedings in the U.K and in other jurisdictions.

6.      **Summary of U.S. Discovery Results:** In the U.K. Action, Applicants assert claims against Urumov, a former London-based OSL employee, Urumov's wife Yulia Balk, shell companies owned and controlled by Urumov, and other individuals and entities acting in concert with Urumov, including, among others,  Ruslan Pinaev ("Pinaev"), Sergey Kondratyuk ("Kondratyuk"), Yevgueni Jemai ("Jemai"), and Vladimir Gersamia ("Gersamia"), for, *inter alia*, breach of fiduciary duty, breach of contract, deceit, conspiracy, accounting, tracing and restitution.  In relevant part, Applicants allege that Urumov and his co-conspirators were the masterminds behind an approximately $160 million fraud on the Otkritie Entities involving certain Argentinean GDP warrants (hereinafter, "the Warrants Fraud").

7.      The assistance this Court has already provided pursuant to 28 U.S.C. § 1782 has been considerable.  Subpoenas issued in connection with the Original, Second, Third, Fourth, and Fifth Applications have yielded literally thousands of pages of documents with information relating to the fraud perpetrated on Applicants.  These documents have not only confirmed

Doc. # DC-8045230 v.5

Applicants' suspicions about the movement of funds in the wake of the Warrants Fraud; they have shed new light on the darker corners of the co-conspirators' asset concealment strategy.

8.      A color-coded chart attached hereto as "Exhibit 8" summarizes the achievements of previous discovery applications.  Very briefly, disclosures resulting from the First and Second Applications, coded in green, identified and confirmed the movement of $150 million in Warrants Fraud proceeds through the accounts of Gemini Investment Fund Limited ("Gemini") at A.B. Bank Snoras ("Snoras"), a now insolvent Lithuanian bank, and Latvijas Krajbanka ("Krajbanka"), a now insolvent Latvian bank.  The Third Application, represented in blue, traced the dissipation by co-conspirator Vladimir Gersamia of $10.1 million in Warrants Fraud proceeds through various entities including Belux Company (Hong Kong) Limited, Templewood Capital Limited, Jaspen Capital Partners Limited, KD Shipping Co. Limited Inc., and Tremlett International Ltd.  The Fourth Application, coded in red, traced the dissipation of Warrant Fraud proceeds from accounts held by a Ukrainian company, Donetsk Steel, Andriy Supranonok, the CEO of Jaspen and a suspected beneficiary of the Warrants Fraud, and a Tajikistan company called Silver LLC ("Silver").  The Fourth Application helped to reveal, among other things, that Silver is partly-owned by co-conspirator Yevgueni Jemai's father.

9.      Discovery relating to the Fifth Application, coded in purple, is ongoing, but has already yielded valuable information concerning the co-conspirators' efforts to use New York-based Newedge USA LLC to intermediate a sale of the Warrants from Otkritie to a third party, Threadneedle Asset Management ("Threadneedle").  If consummated, the transaction would

4

have moved the Warrants Fraud losses off of Applicants' books and perhaps enabled Urumov and his cohorts to avoid detection.

10.   **Overview of Purpose and Scope of Sixth Application**:   This Sixth Application is based on new evidence relating to the dissipation of Warrant Fraud proceeds.   The new evidence was obtained from a combination of disclosures in related proceedings and responses to prior 1782 applications.

11.   **Dissipation of Warrants Fraud Proceeds**:[1]   The Sixth Application seeks to trace the dissipation of millions in Warrants Fraud proceeds from a Gemini account at Krajbanka numbered LV45UBAL1500112343002 (hereinafter, the "Gemini Krajbanka Account") to persons and entities around the world.

12.   Specifically, Applicants seek information concerning: (i) the transfer of $11.4 million from the Gemini Krajbanka Account to a newly-discovered Gemini account at Konversbank (*a/k/a* Conversebank); (ii) transfers of approximately $2.3 million to an account held by Cyprus-based company, Tarmilona Ltd. ("Tarmilona") at Snoras; (iii) a transfer of $296,484 from the Gemini Krajbanka Account to another Krajbanka account held by a senior Gemini official; (iv) a $1.1 million diversion from the Gemini Krajbanka Account to an account held at Piraeus Bank (Cyprus) Ltd. ("Piraeus") by New Zealand-based entity, Delemont Wealth Management ("Delemont"); and (v) transfers of $4 million from the Gemini Krajbanka Account

---

1.   Recent disclosures made in the U.K. Action and related proceedings have identified additional diversions of Warrants Fraud proceeds to the Shell Entities, including at least $4.5 million to Tarmilona.  However, since those transfers were made in Euros or other currencies, they are not the subject of this application, which focuses on U.S. dollar transfers.

5

to another account at Krajbanka held by Cyprus-based Plazmexon Investments Ltd. ("Plazmexon").

13.     In addition, Applicants seek information concerning a previously-unknown account held by Taurus Assets Management, Ltd. ("Taurus") at UBS, which according to disclosures received in response to the Second Application, received U.S. dollars.

14.     Delemont, Gemini, Plazmexon, Tarmilona, and Taurus (the "Shell Entities") are all believed to be controlled by co-conspirators or, at a minimum, to be entities being used by co-conspirators to facilitate the diversion of Warrants Fraud proceeds.

15.     **The Otkritie Entities:** Otkritie Financial is the parent company of an international banking and finance group centered in Russia. *See* Particulars of Claim, dated November 18, 2011, ¶ 1.1, a copy is annexed hereto as "Exhibit 9." Otkritie Financial was established in 1995 and has grown rapidly. Today, Otkritie Financial is one of the leading banking institutions in Russia with over 240 branches.

16.     Otkritie Management is a subsidiary of Otkritie Financial, incorporated in the British Virgin Islands. *See id.* ¶ 1.2.

17.     Otkritie Management acts as an investment holding company and provider of finance to the Otkritie group of companies. *Id.*

18.     OSL is a subsidiary of London-based Otkritie Financial, whose main areas of expertise are securities brokerage, portfolio management, financing and loans on securities, the issuing and cancellation of deposit securities, and the currency market. *Id.* ¶ 1.3.

6

19.     **Georgy Urumov:**  From February 2011 until he was suspended on September 8, 2011, Urumov was a trader in fixed income securities in OSL's London office.  *See id.* ¶ 2.  I am informed that he was formally terminated on December 22, 2011.

20.     Urumov was recruited to OSL from Knight Capital Europe Group ("Knight") in October 2010, along with four members of Knight's fixed income team: Alessandro Gherzi ("Gherzi"), Nipun Ramaiya, Alicia Mujagic, and Jamil Mufti (collectively, the "Knight Traders").  *See* Second Affidavit of Howard Snell, dated December 7, 2011, ¶¶ 16-17, relevant excerpts of which are annexed collectively hereto as "Exhibit 10."

21.     Urumov came highly recommended to OSL's former Chief Executive Officer Roman Lokhov ("Lokhov") by two Otkritie employees: Ruslan Pinaev, an Otkritie trader in London and Moscow, and Sergey Kondratyuk, Otkritie's Head Fixed Income Trader in Moscow. *See* Second Witness Statement of Roman Lokhov, dated November 18, 2011, ¶¶ 40-41, relevant excerpts of which are annexed collectively hereto as "Exhibit 11."

22.     When Urumov joined OSL in February 2011, he was named manager of OSL's Bond Office, making him a leader of OSL's agency trading business.  *Id.* ¶¶ 35-40.

23.     **The Signing-On Fee:**  In November of 2010, following a series of negotiations between Urumov and Lokhov regarding signing-on fees, OSL agreed to pay a multi-million dollar signing-on fee for Urumov and the other Knight Traders.  *See* Ex. 10 ¶ 17.  The signing-on fee payment was intended to be distributed in equal proportion among the five Knight Traders as part of their compensation package.  *See id.* ¶ 18.

Doc. # DC-8045230 v.5

24.     Urumov misled OSL and distributed to his team members only a portion of the signing-on fee, keeping the balance for himself and two of his apparent cohorts, Kondratyuk and Pinaev. *See* Ex. 10 ¶ 19; Second Witness Statement of Howard Snell, ¶ 34, relevant excerpts of which are annexed collectively hereto as "Exhibit 12."

25.     Applicants believe Urumov and his co-conspirators could have been planning this signing bonus fraud, and the Warrants Fraud which is the focus of this Application, for at least several months.

26.     **The First Argentinean Warrants Transaction:** After gaining employment at OSL, Urumov orchestrated a sophisticated fraud on the Otkritie Entities, which resulted in an approximately $160 million loss. *See* Ex. 10 ¶¶ 6, 37-39. Before engineering this loss, Urumov and his co-conspirators engineered a small profitable transaction to ensure they could pull off the larger and more costly transaction. *Id.* ¶¶ 42-43.

27.     On February 25, 2011, OSL entered into a trade involving certain Argentinean GDP warrants having the international identification number ISIN ARARGE03E147 (the "Argentinean Warrants" and, hereinafter, the "First Argentinean Warrants Transaction"). *See id.* ¶ 42; Ex. 12 ¶ 52; *see also* Argentinean Warrant Offering Invitation, relevant excerpts of which are annexed collectively hereto as "Exhibit 13." This security was first issued to the market between April 30, 2010 and June 7, 2010 as part of an offering coordinated by Deutsche, Barclays, and Citibank. *See id.*

Doc. # DC-8045230 v.5

28.     In the First Argentinean Warrants Transaction, co-conspirators caused OSL to purchase 100 million Argentinean Warrants from Bulgarian-based Adamant Capital Partners AD ("Adamant") for $13.02 million.  *See* Ex. 10 ¶¶ 43-44; Ex. 12 ¶¶ 53, 55.

29.     OSL then re-sold the Argentinean Warrants a week later, on March 2, 2011, to Snoras, a Lithuanian financial institution controlled by Vladimir Antonov and recently taken over by the Lithuanian Central Bank.  *See* Ex. 10 ¶ 41. *See* Bloomberg Article on Vladimir Antonov, dated December 15, 2011, a copy is annexed hereto as "Exhibit 14."

30.     The sale was intermediated by JSC Norvik Banka ("Norvik"), a Latvian bank, at a price of $15.47 million.  Ex. 10 ¶ 43; Ex. 12 ¶ 53.  OSL earned a profit of approximately $2.45 million on the trade.  Ex. 10 ¶ 43; Ex. 12 ¶ 53.

31.     At or around the time the Argentinean Warrants were purchased, they were trading at approximately 13 Argentinean pesos (ARS) for 100 bonds.  *See* Ex. 10 ¶ 38.  The conversion rate between US dollars (USD) and Argentinean pesos (ARS) was about 1:4.  *Id.*

32.     In the trades that were processed—with OSL first on the buy-side and a week later on the sell-side—the exchange rate between U.S. dollars and Argentinean pesos was expressed as 1:1 in OSL's Bloomberg trading system.  Ex. 10 ¶ 46; Ex. 12 ¶¶ 56, 59.  Upon information and belief, Urumov and/or Pinaev directed, or caused to be directed, Yevgueni Jemai to enter this incorrect exchange rate.

33.     This first trade in Argentinean Warrants was a dry run for the subsequent fraud— specifically, a way for Urumov and co-conspirators to test an exchange rate tampering scheme and to create the perception of a robust market for the Argentinean security.  *See* Ex. 10 ¶ 42.

9

34.    **Second Argentinean Warrants Transaction:** On March 9, 2011, Urumov and co-conspirators caused OSL to acquire 1.65 billion of the same Argentinean Warrants, *i.e.*, having international identification number, ISIN ARARGE03E147, (hereinafter, the "Second Argentinean Warrants Transaction"). *See* Ex. 10 ¶ 37; Ex. 12 ¶ 47.

35.    OSL paid approximately $213 million for the Warrants at a notional price of $12.9375 for 100 bonds. *See* Ex. 10 ¶ 37; Ex. 12 ¶ 47.

36.    At the time these Argentinean Warrants were purchased, they were trading at approximately 13 Argentinean pesos for each 100 bonds. *See* Ex. 10 ¶ 37. The conversion rate between US dollars (USD) and Argentinean pesos (ARS) was about 1:4. *Id.* ¶ 38.

37.    When the Second Argentinean Warrants Transaction was processed, the exchange rate between US dollars and Argentinean pesos in OSL's Bloomberg trading system was, once again, expressed as 1:1, causing OSL to pay some $213 million for Warrants worth about $53 million, producing a loss of approximately $160 million. *See* Ex. 10 ¶¶ 38-39. We are advised that this $160 million loss figure is subject to revision based on evolving information concerning, *inter alia,* the precise ARS:USD exchange rate and market price for the Warrants at the time.

38.    Senior management agreed to the transaction because Urumov assured them that it was riskless. *See* Ex. 10 ¶ 40; Ex. 12 ¶ 50. Urumov represented he had negotiated a forward sale of the Argentinean Warrants to a third party, Threadneedle, for approximately $228 million, with a maturity of six months, and that OSL would merely be acting as an intermediary in the deal. *See* Ex. 10 ¶ 40; Ex. 12 ¶ 50.

10

39.     Gersamia, then a portfolio manager at Threadneedle, played an essential part in the ruse, holding Threadneedle out as a willing counterparty. *See* Ex. 10 ¶ 40; First Affidavit of Neil Patrick Dooley, dated February 29, 2012, at ¶ 18, excerpts of which are annexed hereto as "Exhibit 15." Gersamia is a Georgian national, a business contact of Urumov, and close friend of Gherzi. *See* Ex. 15 ¶ 18.

40.     The Threadneedle forward sale was never consummated and Threadneedle has insisted it never agreed to such a trade.  Threadneedle later dismissed Gersamia for his role in the fraud. *See* Ex. 10 ¶¶ 40, 54; Ex. 12 ¶ 50.

41.     Applicants believe Urumov and/or Pinaev again instructed Jemai to input the trade into OSL's Bloomberg trading system at the exchange rate of 1:1. *See* Ex. 10 ¶¶ 38-39. Urumov, however, claims to know "nothing whatsoever of the strategy behind the purchase [of the warrants] or whether Otkritie intended to warehouse the warrants." *See* Second Witness Statement of Georgy Urumov, dated November 4, 2011, at ¶ 106, relevant excerpts of which are annexed hereto as "Exhibit 16."  Urumov insists he was absent having his thyroid removed during much of March 2011 when the Second Argentinean Warrants Transaction was being arranged. *Id.*

42.     **Snoras as Counterparty on Behalf of Gemini Investment Fund Limited:** OSL purchased the 1.65 billion Argentinean Warrants from Adamant. *See* Ex. 10 ¶ 41; Ex. 12 ¶ 51. Payment was made in U.S. dollars via Clearstream Banking S.A. ("Clearstream") to Adamant's account at UniCredit Bulbank ("UniCredit"), Account No. BG39UNCR70001510142413. *See*

11

Adamant Capital Partners Securities Trade Confirmation, dated March 9, 2011, a copy of which is attached hereto as "Exhibit 17."

43.    Bloomberg trade tickets dated March 10, 2011 confirm that Snoras sold 1.65 billion Argentinean Warrants to Adamant on March 10, 2011. *See* Bloomberg Trade Tickets for Trades in Argentinean Warrants between Adamant and Snoras, dated March 10, 2011, copies of which are attached hereto as "Exhibit 18."

44.    UniCredit's transaction summary for its Clearstream custodial account —through which the transaction was facilitated—corroborates the purchase of 1.65 billion Argentinean Warrants by Adamant from Snoras and the subsequent sale of the same Warrants to Otkritie. *See* UniCredit Bulbank Letter confirming transactions in the Warrants executed by Adamant, dated January 23, 2012, a copy of which is attached hereto as "Exhibit 19."

45.    In the period during and immediately following settlement of the Second Argentinean Warrants Transaction, from March 16 to March 31, 2011, Gemini, a Bahamian company, received over $150 million in USD wire transfers to the Gemini Krajbanka Account. *See* Gemini Krajbanka Account Statement, dated April 1, 2011, a copy of which is attached hereto as "Exhibit 20." The $150 million was wired in several installments from another Gemini account at Snoras, numbered LT680075800370904456 (hereinafter, "the Gemini Snoras Account"). *See* Snoras Account Statement for Gemini Investment Fund Ltd., Acct. No. LT680075800370904456, dated April 30, 2011 ("Gemini Snoras Account Statement"), a copy of which is annexed hereto as "Exhibit 21."

12

46.     Krajbanka is a Latvian subsidiary of Snoras. *See* Reuters Article on Snoras and Krajbanka, dated November 23, 2011, a copy of which is attached hereto as "Exhibit 22." The bank is likely to be liquidated due to the collapse of its Lithuanian parent. *See id.*

47.     The Gemini Snoras Account Statement shows the outflow of funds for the purchase of the Warrants, confirming Gemini was also involved in the aggregation of the Warrants that were the subject of the Warrants Fraud. *See* Ex. 21. By analyzing debits on the statement with the notation "03E14" (the last few digits of the international identifier for the Warrants) – specifically, by dividing the amounts of those debits by the approximate contemporaneous market price for the Warrants (roughly $3.80 per 100 warrants) – Applicants have established that Gemini purchased some 1.95 billion Warrants. *See id.*

48.     These Warrants are the same ones Adamant sold to Otkritie. The Gemini Snoras Account Statement shows funds flowing into the Gemini Snoras Account that match dollar for dollar – and day for day – with the amounts indicated on the Adamant Clearstream Account statement for the Second Warrants Transaction. *Compare* Ex. 19, *with* Ex. 21.

49.     **Dissipation of Warrant Fraud Proceeds:** With this Application, Applicants seek additional records relating to the following dissipation transactions:

50.     **Diversion of $11.4 Million to Gemini Account at Konversbank:** On March 21, 2011, $20.3 million in Warrant Fraud proceeds was transferred from the Gemini Krajbanka Account to an account held by DIVA Consulting Ltd. ("DIVA") at Snoras (hereinafter, the "DIVA Snoras Account"). *See* Ex. 20 at 2.

13

51.   On November 10, 2011, $10 million was transferred from the DIVA Snoras Account back to the Gemini Krajbanka Account. *See* Gemini Krajbanka Account Statement, dated December 1, 2011, a copy of which is annexed hereto as "Exhibit 23."

52.   On November 16, 2011, $11.4 million, including the $10 million received on November 10, was transferred from the Gemini Krajbanka Account to a previously-unknown Gemini account at Konversbank in Kiev, Ukraine. *See id.* Upon information and belief, at the time of this transaction Konversbank, like Snoras, was controlled by Antonov.

53.   **Diversion of $2.3 Million to Tarmilona:** On March 17, 2011, $2.1 million in Warrants Fraud proceeds was transferred from the Gemini Krajbanka Account to another account at Krajbanka held by Taurus Asset Management Fund Limited (hereinafter, "Taurus" and the "Taurus Krajbanka Account"). *See* Ex. 20; Taurus Krajbanka Account Statement, dated April 1, 2011, a copy of which is attached hereto as "Exhibit 24."

54.   Later the same day, the same $2.1 million was wired from the Taurus Krajbanka Account to an account at Snoras held by Tarmilona (hereinafter, the "Tarmilona Snoras Account"). *See* Ex. 24.

55.   On March 21, 2011, another $198, 951 in Warrants Fraud proceeds was transferred from the Gemini Krajbanka Account to the Taurus Krajbanka Account. *See* Ex. 20; Ex. 24.

56.   Later the same day, $197,764 of this amount was transferred to the Tarmilona Snoras Account. *See* Ex. 24.

14

57.    **Diversion of Nearly $300,000 to Stanislav Kovtun:** On March 24, 2011, $296,484.22 was wired from the Gemini Krajbanka Account to an account held by another Bahamian entity, Gemini Advisors Limited ("Gemini Advisors"), also at Krajbanka (hereinafter, the "Gemini Advisors Krajbanka Account"). *See* Ex. 20; Gemini Advisors Krajbanka Account Statement, dated April 1, 2011, a copy of which is attached hereto as "Exhibit 25."

58.    Also on March 24, 2011, the same funds, dollar for dollar, were wired to a personal account belonging to Stanislav Kovtun at Krajbanka. *See id.* at 2.

59.    Kovtun has identified himself as the "sole beneficial shareholder of Gemini Advisors Limited which held the sole management share in Gemini Investment Fund Limited." *See* Witness Statement of Stanislav Kovtun, dated February 6, 2012, ¶ 1, relevant excerpts of which are annexed collectively hereto as "Exhibit 26."

60.    **Diversion of $1.1 Million to Delemont:** On March 24, 2011, $1,183,288.80 in Warrants Fraud proceeds was wired from the Gemini Krajbanka Account to an account held by a Bahamian entity Lion Investment Fund Limited ("Lion") at Snoras. *See* Ex. 20.

61.    According to discovery obtained pursuant to a previous 1782 application, nearly the same amount – $1.1 million – was later transferred from the Lion account to an account held by New Zealand-based Delemont Wealth Management Limited at Piraeus Bank (Cyprus) Ltd. *See* Abstract of Disclosures Relating to Transfer of $1.1 million from Lion to Delemont, a copy of which is attached hereto as "Exhibit 27."

62.    **Diversion of $4 Million through Plazmexon:** On March 29 and March 30, 2011, two payments totaling $4 million were made from the Gemini Krajbanka Account to the account

15

of Plazmexon Investments Ltd. ("Plazmexon") at Krajbanka (hereinafter, the "Plazmexon Krajbanka Account"). *See* Ex. 20.

63.     On March 30, 2011, $2,121,239.84 of this total was wired from the Plazmexon Krajbanka Account to an account held by Snoras at HSBC Private Bank (Suisse) ("HSBC"). *See* Plazmexon Krajbanka Statements, dated April 1, May 1 and June 1, 2011, at 1, attached collectively hereto as "Exhibit 28."

64.     On April 4, 2011, $55,000 in Warrants Fraud proceeds was wired from the Plazmexon Krajbanka Account to an account held by Danforth Ventures Inc. ("Danforth") at Snoras (hereinafter, the "Danforth Snoras Account"). *See id.* at 2.

65.     On April 26, 2011, another $37,999 was wired from the Plazmexon Krajbanka Account to the Danforth Snoras Account. *See id.* at 3.

66.     On May 12, 2011, another $50,000 was wired from the Plazmexon Krajbanka Account to the Danforth Snoras Account. *See id.* at 4.

67.     On May 13, 2011, another $10,000 was wired from the Plazmexon Krajbanka Account to the Danforth Snoras Account. *See id.* at 4.

68.     On April 5, 2011, $300,000 was wired from the Plazmexon Krajbanka Account to an account held by Corrigan Associates Ltd. ("Corrigan") and believed to be at Krajbanka. *See id.* at 2.

69.     On May 3, 2011, $150,000 in Warrants Fraud Proceeds was wired from the Plazmexon Krajbanka Account to an account held by Vladimir Antonov at Krajbanka. *See id.* at 4.

16

70.    **Taurus Account at UBS:** Disclosures obtained in connection with prior 1782 applications have also identified a previously unknown account used by Taurus at UBS. *See* Abstract of Disclosure Relating to Taurus UBS Account, a copy of which is attached hereto as "Exhibit 29."

71.    Upon information and belief, DIVA, Taurus, Tarmilona, Gemini Advisors, Lion, Delemont, Plazmexon, and Danforth are all shell entities under the control of or associated with perpetrators of the Warrants Fraud.

72.    According to bank records obtained in connection with Applicants' investigation, Snoras used Raiffeisen Zentralbank ("Raiffeisen") as a correspondent bank for transactions requiring U.S. dollars. *See* Ex. 20 (indicating that wires of U.S. dollars from Bank Snoras into Latvijas Krajbanka were processed by "RFB," or Raiffeisen Bank).

73.    According to public records, BONY, Deutsche, J.P. Morgan, Standard Chartered and Wells Fargo serve as correspondent banks for Raiffeisen. *See* Raiffeisen Website Screenshot, dated January 18, 2012, a copy of which is attached hereto as "Exhibit 30."

74.    Public records indicate that BONY, Deutsche, J.P. Morgan and Standard Chartered also serve as correspondent banks for Piraeus' U.S. dollar transactions. *See* Piraeus Website Screenshot, dated October 1, 2012, a copy of which is attached hereto as "Exhibit 31."

75.    Raiffeisen serves as the correspondent bank for Konversbank's U.S. dollar transactions. *See* ConverseBank Correspondent Bank Information, dated October 1, 2012, a copy of which is attached hereto as "Exhibit 46." As set forth above, BONY, Deutsche, J.P.

17

Morgan, Standard Chartered, and Well Fargo provide U.S. dollar clearing services for Raiffeisen.

76.    Deutsche serves as the correspondent bank for Krajbanka's U.S. dollar transactions. *See* Screenshot of Krajbanka Correspondent Banks, dated January 18, 2012, a copy of which is attached hereto as "Exhibit 45."

77.    Upon information and belief, HSBC clears U.S. dollar transactions through its New York-based affiliate, HSBC Bank USA, N.A.

78.    Upon information and belief, UBS does its own U.S. dollar clearing.

79.    **U.K. Civil Proceedings:** On October 5, 2011, after uncovering misappropriations by Urumov relating to the signing-on fee (*see* Ex. 10 ¶ 7), Otkritie applied for and obtained without notice to Urumov an *ex parte* freezing order and proprietary injunction against Urumov. *See* October 5 Freezing Order issued by HHJ Judge Mackie QC, a copy is annexed hereto as "Exhibit 32." The freezing order precluded Urumov from in any way disposing of, dealing with, or diminishing the value of the signing-on fee of $23 million paid by Otkritie to Urumov on November 22, 2010. *Id.*

80.    On October 21, 2011, after further review of Otkritie's evidence and Urumov's defenses, Justice Burton confirmed and extended the October 5, 2011 asset freeze until further order of the court. *See* Ex. 10 ¶ 9; October 21 Freezing Order issued by Burton J., a copy is annexed hereto as "Exhibit 33."

Doc. # DC-8045230 v.5

81.    On December 7, 2011, the previous freezing orders were expanded by $160 million to incorporate suspected proceeds of the Warrants Fraud. *See* December 7 Freezing Order issued by Burton J., a copy is annexed hereto as "Exhibit 34."

82.    On December 8, 2011, Applicants filed an amended "Claim Form," similar to a rudimentary complaint, refining their claims in the U.K. Action. A copy of the December 8, 2011 Claim Form is annexed hereto as "Exhibit 35."

83.    We are advised by U.K. counsel that on March 1, 2012 the Applicants applied for the following orders later granted by Justice Flaux: (i) an order to join ten (10) additional defendants to the Action including, among others, Pinaev, Kondratyuk, and Yevgueni Jemai; (ii) an order to freeze the assets of the new defendants in various amounts between $2.5 and $160 million; and (iii) an order for judgment against one of the defendants, Dunant International SA ("Dunant") for $34 million. Copies of these orders are annexed hereto as "Exhibits 36 to 38."

84.    On March 16, 2012, Justice Teare extended, until further order of the U.K. court or trial, the freezing order made by Justice Flaux.

85.    In late March 2012, the Applicants became the registered owners of a property in England previously owned by Dunant and purchased for $32 million in April 2011 using monies misappropriated from the Applicants.

86.    On May 10 2012, the Applicants applied *ex parte* to add four additional defendants to the U.K. Action—the sisters of two previously named defendants and their offshore companies. Applicants also sought a freezing order covering the assets of the four additional defendants. Applicants' requests were granted by order of Justice Gloster dated May

19

10, 2012. *See* Order of Gloster J., dated May 10, 2012, a copy is annexed hereto as "Exhibit 39." Ancillary to the application in the U.K. Action, Applicants have also taken steps to freeze a property in Spain acquired by one of the new U.K. defendants for approximately $6 million and to proceed against Pinaev in Israel. We are advised that these applications were granted as well.

87.     On May 25, 2012, Justice Hamblen extended Justice Gloster's freezing order.

88.     On June 14, 2012, the Applicants applied *ex parte* to add one additional defendant to the U.K. Action, the wife of Pinaev. Applicants also sought a freezing order covering her assets and permission to initiate proceedings against her in Israel. Applicants' requests were granted by order of Justice Cooke dated June 14, 2012. See Order of Cooke J., dated June 14, 2012, a copy is annexed hereto as "Exhibit 40".

89.     On June 29, 2012, Justice Smith extended, until further order of the U.K. Court or trial, the freezing Order entered by Justice Cooke.

90.     On July 16, 2012, Applicants applied for entry of a judgment of default against FO Firmly Oceans Corp., Natalia Demakova and Qast International S.A. Justice Teare entered default judgment against the three defendants for $36.8, $19.9 and $16.9 million, respectively. A copy of these orders is annexed hereto as "Exhibit 41."

91.     On July 18, 2012, there was a case management hearing before Justice Walker. The trial in the U.K. Action is now set for June 2013.

92.     On September 27, 2012, Applicants applied for entry of a judgment of default against Kondratyuk. Justice Field entered default judgment against the defendant for $183 million. A copy of this order is annexed hereto as "Exhibit 42."

20

93.     On November 9, 2012, Applicants applied for default judgment against four other defendants connected to the Jemai family.  Default judgment was entered against Vantax Limited only by Justice Hamblen as at the last moment appearances were entered by the other three defendants being Jecot SA, Yevgueni Jemai and Irina Jemai.

94.     U.K. counsel has also advised that defenses have now been served by a number of defendants in the U.K. Action, including Urumov and Pinaev.  Urumov and Pinaev have denied any wrongdoing.  In particular, they assert that the instructions for the Warrants Fraud trades came from senior management of the Applicants; that the moneys received by Gemini were part of a commercial arrangement with Gemini; and that all dealings with Gemini were handled by Kondratyuk.

95.     We are also advised by U.K. counsel that they cannot issue demands against the New York-based Discovery Respondents because they are not subject to the U.K. court's jurisdiction.   As a result, any efforts to obtain discovery would need to be processed pursuant to the Hague Convention; would take many months, providing Urumov and his co-conspirators more time to dissipate the diverted funds; and would be unlikely to provide the same level of response as this Application.

96.     In addition, U.K. counsel advises us that there would be no restrictions under U.K. law on Applicants' use of any discovery obtained through this Application in connection with any judicial proceedings relating to the U.K. Action.

97.     **Other Proceedings:** Both the signing-on fee misappropriation described above and the Argentinean Warrants Fraud have been reported to the U.K. Financial Services Authority

21

and the City of London Police. *See* Ex. 10 ¶ 8. Criminal investigations are ongoing in England, and have the Otkritie Entities' full cooperation.

98.     As part of its ongoing investigation into the Warrants Fraud, Otkritie has also directed a criminal complaint against Urumov and his co-conspirators to Swiss authorities. *See id.* ¶ 10.

99.     On November 21, 2011, one of Urumov's suspected co-conspirators, Kondratyuk, was arrested in Zurich. *See id.* ¶ 14.

100.    On November 25, 2011, Kondratyuk appeared before a Swiss magistrate and was remanded into custody, where he remains, on suspicion of fraud and money laundering. *See id.* ¶ 64.

101.    We are advised that, in April 2012, the Geneva Public Prosecutor indicted Yevgueni Jemai's mother, Olessia Jemai, on charges of money laundering.

102.    In addition, we are advised that the Geneva Public Prosecutor has frozen nearly $50 million in cash assets and property assets worth in excess of $17 million. *See id.* ¶ 15.

103.    Applicants have commenced related proceedings in jurisdictions such as Hong Kong, Gibraltar, Luxembourg, Israel, and the Bahamas. *See* Third Witness Statement of Neil Dooley, dated December 14, 2011, at ¶¶ 13-21, excerpts of which are annexed hereto as "Exhibit 43."

104.    **Notice:** Contemporaneous with the filing of this Sixth Application, Applicants are providing copies of these papers to the General Counsel's offices of the Discovery Respondents.

22

105.   **Dissipation of Misappropriated Funds and Dilatory Tactics:** Applicants do not believe that Urumov, Kondratyuk, Jemai, or their cohorts need to be provided with notice of these proceedings because they have expressly disavowed any knowledge of, or involvement in, the Second Argentinean Warrants Transaction to which this Application is addressed. *See* Ex. 11 ¶ 106.

106.   Furthermore, Applicants oppose giving notice of these proceedings to Urumov, Kondratyuk, Jemai, or their co-conspirators because Applicants believe, based upon recent experience, that they may seek to interfere with these proceedings and attempt to further conceal misappropriated funds. *See, e.g.,* Ex. 10 ¶¶ 113-15.

107.   In the U.K. Action, when ordered by the court to disclose the full extent of his assets, Urumov failed to identify several companies he owned or otherwise controlled, including Dunant, which was later discovered to have transferred of funds in breach of the U.K. court's October 5 Freezing Order. *Id.* ¶¶ 110-11. Moreover, Urumov, failed to disclose that his wife had acquired a property in the U.K., in Dunant's name, for $32 million. *See id.* ¶¶ 105-06.

108.   Furthermore, on September 27, 2012, Justice Field ordered that Pinaev and his wife must submit to cross-examination regarding their assets because he was not satisfied that they had complied with their asset disclosure obligations. *See* Order of Field J., dated September 27, 2012, a copy of which is attached hereto at "Exhibit 44."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       November 13, 2012

Michael C. Miller

24